FOURTH NAT. BANK OF CITY OF NEW YORK *v.* AMERICAN MILLS CO. and others.

*(Circuit Court, S. D. New York.  January 19, 1886.)*

1. PRINCIPAL AND AGENT—DEL CREDERE COMMISSION—LIEN—BILL OF SALE— INSOLVENT PRINCIPAL.

An agent under a *del credere* commission has a lien for all commissions and advances to his principal, and, if these exceed the value of the goods, a bill of sale to him by insolvent principal, though perhaps technically illegal, will be sustained as a foreclosure of the lien.

2. SAME—SET-OFF.

In such a case, where the agent has used large acceptances of his principal for his own benefit, he is not obliged, for the benefit of creditors of his principal, to set these off against his acceptances for his principal, and release the security of his lien to that extent.

In Equity.

*David Willcox,* for complainant.

*Alex. Thain,* for defendants Graeffe and another.

*Samuel W. Bower,* for defendants American Mills Co. and others.

COXE, J. The complainant is a national banking association. The defendant the American Mills Company was at the time in question a manufacturing corporation organized under the laws of New York, having its principal office in the city of New York, and its manufactory at Warwick, in the state of Rhode Island. The defendant Albert J. Graeffe was treasurer and a trustee of this company, and the commission merchant in New York to whom its goods were consigned. On the twenty-eighth of February, 1881, Graeffe had in his possession merchandise of the company, in value about $45,000. He had, prior to this time, accepted, for the benefit of the company, its drafts drawn upon him, against the consignments, for upwards of $50,000. Other acceptances, amounting to $32,-500, had been used by Graeffe personally in his business without advantage to the mills company. None of the drafts, whether used by Graeffe or the company, were due on the twenty-eighth of February. On that day the company transferred to Graeffe, as absolute owner, the goods in his possession, he taking them in discharge, *pro tanto,* of the company's indebtedness to him. On the following day Graeffe sold the

goods to his wife, Mary J. Graeffe, for $45,064, in part payment of a debt due from him to her. The sale was made through her agent, the defendant Garner.

On the third of March Graeffe made a general assignment for the benefit of his creditors. The mills company failed at the same time. On the thirtieth of March, 1881, the complainant recovered a judgment against the mills company and Graeffe for $2,533.84, in the supreme court of the state of New York, and on the twenty-second of June, 1881, it recovered another judgment against the same parties for $18,224, in the court of common pleas of the city of New York. Executions issued upon these judgments were returned *nulla bona*, September 1, 1881. Subsequent to the failure, and before July 1, 1881, other judgments were obtained against the company in New York and Rhode Island for over $70,000.

The complainant now seeks to recover from Mary J. Graeffe the amount due upon its judgments, upon the theory that she is indebted to the mills company for the value of the goods; the transfer to her being, it is alleged, without consideration, and constructively fraudulent. No accusation of actual fraud is made against any of the defendants. It is not disputed that there was a *bona fide* indebtedness from the defendant Graeffe to his wife of over $100,000. This being true, he had, undoubtedly, a strict legal right, if he owned the goods, to transfer them to her in payment, although the propriety of such a proceeding upon the eve of bankruptcy may well be doubted. The important question, therefore, and practically the only question to be determined, is, did the mills company, on the twenty-eighth of February, prior to the transfer, have any tangible interest in the goods out of which the complainant could have made its debt? Did the transfer in any way injure the complainant?

In determining this question,—in deciding what the parties could and could not do,—attention should be directed, not to subsequent events, but to the situation as it existed upon and prior to the twenty-eighth of February, 1881. On that day the defendant Graeffe had in his possession goods consigned to him by the mills company under a *del credere* commission, the market value of which was about $45,000. His books show that he had advanced, as against these goods, by cash and acceptances, a sum considerably in excess of their value,—about $54,000. For this sum he had a valid lien. When, therefore, the bill of sale was given, the mills company held the legal title, but it was valueless. The goods were incumbered for more than they were worth. They could not have been disposed of except with this charge upon them. A creditor of the mills company, by taking the goods in execution, could not have divested the lien. When the parties met, the mills company, recognizing the lien and admitting liability in excess of the security, passed the title to Graeffe. He received no preference or advantage. He acquired no rights that the law would not have given him. It was, in effect, agreeing to a foreclosure of the lien without the expense and delay of legal proceedings.

Assuming, as it seems to be assumed, that there was in all this no actual fraud, why was it not a legitimate transaction,—why was it not a disposition of the property which the parties, if they desired to do so, had a legal right to make? If the mills company had only a contingent interest in the goods, it would seem a harsh and inequitable use of the doctrine of merger to hold that because Graeffe received the bill of sale, which was, perhaps, technically illegal, he therefore lost his lien, and by this inconsequential mistake the complainant is to receive $20,000 which it could receive in no other way. It is true that Graeffe, instead of securing his wife, should have paid the joint indebtedness; it is not easy, however, to perceive how his failure in this regard can avail the complainant.

But it is denied that the lien amounted to the value of the goods. On the contrary, it is asserted that it amounted only to $21,715, and this, for the reason that Graeffe had used other drafts of the mills company, amounting to $32,500, for his own personal benefit, and, as between themselves, the company was under obligation to discharge a net balance of acceptances amounting to $21,715, and no more. The views of counsel are so at variance upon this proposition that the record has been searched for a rational explanation of this somewhat abnormal transaction, but with only partial success. The acceptances involved do not appear upon Graeffe's books in his account with the mills company. At one time he asserts that the proceeds were received by him and used in his business; at another, his testimony would indicate that they were used to meet maturing acceptances, in order to continue the accommodations to the mills company. The motives which actuated the parties, the terms of the agreement under which these drafts were used by Graeffe, and the consideration therefor, are not satisfactorily explained. It seems, however, that it was a separate and distinct transaction, and was so regarded by the parties. As between themselves, fair dealing would seem to demand that they should have made an agreement in the form stated by the complainant; but, on the contrary, Graeffe, being liable to pay $54,000 received by the mills company, was not called upon, unless he desired to do so, to release his security, or any portion thereof, because the company was liable to pay $32,500 of acceptances of which he had had the exclusive benefit. Instead of demanding any concessions from him in this respect, the company expressly recognized his claim for the full amount. It is true that he might have relinquished a part of his security,—quite likely he ought to have done so, —but the lien which the law gave him he chose to retain, and the company acquiesced in his action in this regard. The transaction was unilateral, but not unlawful.

The case is a difficult one in many of its aspects, but the conclusion cannot be resisted that the complainant is without relief in this action. The bill is dismissed.